BABCOCK *v.* BENSON *et al.*

*(Supreme Court, General Term, Fifth Department. October 23, 1890.)*

NEGOTIABLE INSTRUMENTS—DELIVERY.

    Upon an issue whether a note of $500, payable in six years, executed by defendant's testator to plaintiff, his son, had been delivered, it appeared that plaintiff had worked for testator a number of years without pay; that testator, being sick, summoned his family, including plaintiff, to his room, and, producing the note, told them it was for plaintiff, and asked him if that would be enough, and upon his an-

swering that it would be, testator handed the note to his daughter to be laid aside until he was able to sign it; that the note was signed the next day, and laid away in a bureau in testator's room, to which plaintiff had access; that soon after, and while his father was living, plaintiff took the note from the bureau and examined it, and that after testator's death plaintiff assented to the family resolve that it was best to place the note, for his benefit, with one of the executors. *Held*, that a finding that there was no delivery and acceptance of the note would be set aside.

Appeal from special term, Erie county.

Action by Dwight Babcock against Martin B. Benson and another, executors, etc. From an order denying his motion to set aside the referee's report and for a new trial plaintiff appeals.

Argued before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*J. N. Goodwill,* for appellant. *J. G. Johnson,* for respondents.

DWIGHT, P. J. The proceeding was by a reference under the statute. The disputed claim was on a promissory note of $500, payable in six years, with interest, executed by the deceased to the plaintiff. The only question considered by the referee was that of the delivery of the note, and this we agree was the only question in the case. Counsel for the defendants discuss, besides, the questions of want of consideration and of certain supposed conditions upon which the note should take effect. In respect to the last-mentioned question it is to be said that there is no finding and no evidence that any conditions were attached to the making or proposed delivery of the note. The defendant Benson, who drew the note for the deceased and who afterwards became one of the executors of his will, testified that he told the plaintiff that the deceased proposed certain conditions upon which the witness should deliver the note to the plaintiff; but there is no evidence of the fact that such conditions were ever proposed by the deceased to the witness, and the note was not left with the witness for delivery. The referee very properly makes no finding on the subject of conditions. In respect to the question of consideration, we observe that the note purported to be given for value received; that the evidence shows that the plaintiff had worked for the deceased, his father, for a number of years after he became of age; that the deceased recognized his obligation to pay for those services, which the referee finds were rendered at his instance and request, and that the amount of the indebtedness was liquidated by the parties to the note at the sum named therein. Manifestly, the only question in the case was that of the delivery of the note, and upon that question the evidence and findings are to the following effect: The deceased, being confined to his bed and in a very feeble condition, called his wife, his daughters, and the plaintiff into the room, and, producing the note not signed, said to them: "Here is a note I have had drawn for Dwight, for five hundred dollars. He has stayed here since he was twenty-one, and I want he should have that much." He asked the plaintiff if that would be enough, to which the latter answered that it would be, and thereupon he handed the note to his daughter Mrs. Hoxie, and asked her to lay it aside until he felt able to sign it. She layed it in the drawer in the bureau which stood in the room. The next day he asked Mrs. Hoxie to bring him the note, and upon her doing so he signed it with her assistance, and she again laid it away in the bureau drawer. Later, on the same day, the deceased told the plaintiff that he had signed the note, and that it was in the bureau drawer. The bureau was one to which the plaintiff had free access, and his mother testifies that after the note was signed and both before and after his father's death she saw the plaintiff have the note in his hands. Some weeks after the death of the testator the widow, her daughter Mrs. Hoxie, and the plaintiff went together and took the note to Mr. Benson, about three miles away, and left it with him. It was the mother who personally carried the note and handed it to Mr. Benson, and the plaintiff was not present at that moment, but the mother testifies on that subject as follows: "We kept

the note in the house several weeks; we then took it to Mr. Benson; we thought we would leave it with him;" and further that she had received no directions from her husband to take the note to Mr. Benson, and that she had no reason for doing so except for the benefit of the plaintiff; and Mrs. Hoxie testifies that when her mother handed the note to Mr. Benson she told him that "the note was to run for such a length of time, that he might keep it as he had charge of the other business." These were, apparently, simple-minded people who made common cause of what concerned any member of the family. The son, who had always lived with his parents and been "subject unto them," had probably not developed much individuality of character. He seems not to have been in the habit of questioning what his parents proposed. When his father summoned the family to his bedside and exhibited the note which he had procured to be drawn "for Dwight," and told them what it was for, the son tacitly consented to accept a note in payment for his years of labor; and when his father asked him if the amount named was sufficient, he expressed his consent. When, on the next day, his father told him that the note was signed, and where it had been put, he again consented, by his silence. Up to this time it does not appear that the plaintiff knew at what time the note was made payable, but very soon after and while his father was still living he took the note from the drawer and examined it. At this time, as the referee remarks, it must be assumed that he learned, if he did not know before, the terms of the note, but he made no objection to the long time it had to run, and again, by his silence, indicated his assent to the entire arrangement. It is true he returned the note to the bureau drawer, but we see in this fact no indication that he declined or hesitated to accept the note, but rather that he approved and adopted the repository which had been selected by his sister for its safe-keeping. And, finally, he as readily concurred with his mother and sister in the family resolve that it was best to place the note, for his benefit, in the hands of the executor, Mr. Benson, "as the note had such a length of time to run, and he had charge of the other business."

It is impossible after reading the simple story of this domestic transaction to resist the conviction that every member of the family understood that the father had given to the son a promise in writing to pay him what was his due. That such was the intention of the father we cannot doubt. The two interviews before and after the signing of the note must be considered as one. In the first, as the mother testifies, her husband told Dwight that he had had this note drawn for him, and he wanted he should have it; in the second, that he had signed the note, and it was in the bureau drawer; and to all of this the son consented. We think the evidence fairly establishes the fact that the father intended and the son understood that the transaction of giving the note was complete; that the note was drawn and signed and placed in the bureau drawer for Dwight; that it was the property of the latter, and a valid and binding evidence of indebtedness of his father to him; and delivery was effectuated, if such was the intent and understanding of the parties. Such a delivery required no formality of word or act. The effect of what was done depended upon the intention of the parties as evidenced by the circumstances of the transaction. *Bracket* v. *Barney*, 28 N. Y. 333; *Holliday* v. *Lewis*, 14 Hun, 478. And if the minds of the parties met in the understanding that the note had passed from the control of the father to that of the son, that constituted a delivery. In this case we think the referee held the plaintiff to a stricter rule than was justified in regard to the requisites of a delivery, and that his conclusions of fact, which negative the theory of a delivery and acceptance of the note, are contrary to the just effect of the undisputed evidence in the case. It results from these views that the order appealed from should be reversed, and a new trial granted before another referee, with costs to the appellant to abide the final award of costs. All concur.